Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se une la Juez Asociada Señora Rodríguez Rodríguez.
Este Tribunal, nuevamente, le exige a las personas in-teresadas en la protección ambiental que cumplan con un grado de prueba mayor que el que nuestra doctrina re-quiere para demostrar la posibilidad de sufrir un daño irreparable. En esta ocasión, se tildan de “meras alegacio-nes” los argumentos presentados por un grupo de ciudada-nos y ciudadanas para que se paralice la concesión de per-misos para desarrollos en un área de alto valor ecológico, mientras el Tribunal de Apelaciones dilucida si se violaron las normas sobre planificación y la política pública ambien-tal al autorizar el desarrollo en esos terrenos. Así, una ma-yoría de este Tribunal permite que se inicien los procesos para construcciones en la zona del Corredor Ecológico del Noreste sin que se haya determinado finalmente si la libe-ración de esos terrenos previamente protegidos cumplió con las normas de planificación y protección ambiental. Por entender que ese proceder obstaculiza la labor del foro *1058 apelativo y pone en peligro una reserva natural de gran importancia para el pueblo puertorriqueño, disiento.![1])
I
La Sentencia que avala una mayoría de este Tribunal reconoce que los tribunales apelativos tienen facultad para emitir órdenes, producto de mociones en auxilio de juris-dicción, con el propósito de hacer efectiva su jurisdicción en los asuntos que tienen pendientes y evitar fracasos en la administración de la justicia. En el caso del Tribunal de Apelaciones, esa potestad está establecida en la Regla 79 de su Reglamento y en ésta se basó el foro apelativo al tomar la decisión de paralizar temporeramente los trámi-tes administrativos relacionados con la concesión de permi-sos de construcción para el área cuya calificación y protec-ción se encuentra en controversia.
Uno de los reclamos de los grupos de ciudadanos en su recurso de revisión es que, utilizando erróneamente el me-canismo de exclusión categórica, las agencias no prepara-ron los documentos ambientales que nuestro ordenamiento requiere que se realicen antes de tomar decisiones que pueden afectar significativamente el medio ambiente. Rei-teradamente, hemos manifestado que estos estudios se tie-nen que llevar a cabo en las etapas más tempranas del proceso de planificación para el otorgamiento de permisos por parte del Gobierno.!([2]) No tiene sentido posponer el aná-lisis sobre el impacto ambiental que podrían tener ciertos *1059 desarrollos en el área del Corredor para después de que se hayan otorgado los permisos para los mismos, o, peor aún, después de que hayan iniciado las construcciones. Por eso, al paralizar la concesión de permisos mientras resuelve esta controversia, el Tribunal de Apelaciones, lógicamente, actuó para preservar su jurisdicción y evitar que el caso pendiente de adjudicación se tornara académico.
Además, los ciudadanos argumentan que la reclasifica-ción de ciertos terrenos del Corredor y hacer viable consul-tas de ubicación sobre éstos tiene el efecto de flexibilizar los criterios de evaluación de cumplimiento ambiental para los proyectos propuestos para el área. Permitir que se con-sideren las solicitudes de permisos antes de que se re-suelva el caso puede conllevar que el Gobierno tome deci-siones sobre bases inadecuadas. Si el recurso se resuelve a favor de Iniciativa para un Desarrollo Sustentable (IDS), los permisos concedidos podrían ser inválidos y se habrían desperdiciado recursos tanto del Estado como de las em-presas desarrolladoras.
El Estado alega que la orden del tribunal apelativo im-pide la gestión gubernamental al paralizar sus funciones ministeriales dirigidas a la sana administración pública.![3]) Sin embargo, el foro apelativo fue muy cuidadoso al dictar su Resolución y limitó la paralización temporera a las so-licitudes de concesión de permisos de desarrollo y construc-ción en el área en controversia, haciendo la salvedad de que “[e] sta [paralización no será aplicable a cualquier ges-tión administrativa conducente a la realización de estudio, evaluación o documento ambiental dirigido a dar cumpli-miento al proceso de planificación ambiental”.![4]) Por lo tanto, las funciones ministeriales primárias de las agen-cias de permisos del Gobierno nunca fueron suspendidas.
La paralización temporera tampoco provocaba un daño *1060 a las partes interesadas en obtener los permisos, en parte porque las estadísticas sobre la actividad de la construc-ción demuestran que no existe demanda para desarrollos turísticos, residenciales y comerciales en estos momentos. ([5]) Esperar a que el Tribunal de Apelaciones resolviera la controversia no hubiese tenido un efecto significativo sobre proyectos en riesgo de quedarse estancados en la fase de construcción en lo que mejora la situación económica del País, como ha sucedido con muchos otros desarrollos en el área.([6])
Si el Tribunal de Apelaciones decidió acceder a la solici-tud de paralización fue porque evaluó las posiciones de am-bas partes y concluyó que el Corredor Ecológico sufriría un daño irreparable si no se suspendía la concesión de permi-sos, mientras que ni la otra parte ni el interés público ex-perimentarían un daño sustancial como consecuencia de la paralización. ([7]) Más importante aun, si el foro apelativo *1061 concedió la paralización, en su sana discreción y amparado en su poder inherente para así hacerlo, fue porque enten-dió que de esa forma garantizaría su jurisdicción.([8]) Al suspender los efectos de la orden de paralización, este Tribunal limita injustificadamente la facultad del foro apelativo de velar por mantener la eficacia de su jurisdicción.
II
Una mayoría de este Tribunal revoca sin mayor análisis la decisión del foro apelativo, que tomó en consideración no sólo la moción en auxilio de jurisdicción sino también el expediente completo del recurso de revisión y la oposición del Gobierno, para establecer un remedio que protegiera su jurisdicción con el menor impacto posible para la parte afectada. La Resolución del Tribunal de Apelaciones describe, específicamente, las acciones que se paralizaban y las acciones que podían continuar, lo cual demuestra que, distinto a lo que señala la Sentencia de este Tribunal, ese foro analizó cuidadosamente los criterios para conceder ór-denes de paralización.
Asimismo, la moción en auxilio de jurisdicción, que la Sentencia cataloga como escueta e insuficiente para pedir el remedio que concedió el Tribunal de Apelaciones, discute y fundamenta las razones por las cuales cumple con todos *1062 los requisitos para la expedición del auxilio.([9]) La Senten-cia de este Tribunal se basó únicamente en los señalamien-tos relacionados con el “daño irreparable” discutidos en la moción en auxilio de jurisdicción para su decisión de revo-car al foro apelativo. Contrario a lo que indica la Senten-cia, los señalamientos sobre el daño irreparable que sufri-rían los peticionarios de no concederse el auxilio no son “alegaciones en el vacío”, sino que hacen referencia al his-torial del Corredor y de la controversia ante el foro apela-tivo, así como a los documentos contenidos en el Apéndice del Recurso de Revisión, incluso las evaluaciones para de-sarrollos específicos de hoteles dentro del Corredor prepa-radas a petición del Gobierno y mapas de ubicación de pro-yectos propuestos.!([10]) Además, se particularizan los proyectos que se encuentran ante la consideración de las agencias de permisos, que ubicarían dentro del área del Corredor cuya protección se reclama en el recurso ante el Tribunal de Apelaciones.!([11]) De aprobarse estos proyectos, se construirían más de dos mil seiscientas (2,600) unidades residenciales y cuartos de hotel y condohotel, además de las instalaciones relacionadas con el funcionamiento de esos desarrollos y un centro comercial. La mayoría de esos *1063 proyectos se encuentra en proceso de consulta de ubica-ción, el trámite administrativo para que la Junta de Plani-ficación evalúe usos de terrenos propuestos para zonas en las que éstos no están permitidos por la reglamentación aplicable, pero que esa agencia tiene discreción para autorizar.!([12])
La Sentencia que hoy se emite señala que la solicitud de auxilio no menciona permisos que ya se hayan aprobado ni presenta evidencia de construcciones que se estén reali-zando en el Corredor en el presente.!([13]) Precisamente, eso es lo que IDS quiso evitar al pedir que se paralizaran las consultas de ubicación y los procesos de concesión de permisos. El fin de las consultas y los permisos es que se lleve a cabo un desarrollo, y el propósito de la petición de paralización es que no se construyan proyectos en los te-rrenos sobre los que trata el caso hasta tanto se adjudique el nivel de protección que merecen esas tierras y los requi-sitos de planificación ambiental que se tienen que cumplir si se permite algún tipo de desarrollo en el área.
Cuando se solicita una orden de paralización en auxilio de jurisdicción es porque, de no actuar con premura, las consecuencias serán irreversibles o el caso se tornará académico. En casos como el presente, en el que se argu-menta que se estarían permitiendo desarrollos sin haberse preparado los documentos ambientales requeridos y sin cumplir con las normas adecuadas de planificación, es de vital importancia la intervención oportuna de los tribunales.![14]) Hemos establecido que incumplir con el re-querimiento de preparar una declaración de impacto am-biental, en las etapas más tempranas del desarrollo, es “de por sí considerado un daño irreparable” debido al carácter *1064 permanente de los daños ambientales.([15]) Además, Puerto Rico ha adoptado como política pública el principio inter-nacional de prevención o precautionary principle, que dicta que, cuando exista la posibilidad de daños graves o irrever-sibles al ambiente, no se pueden posponer las medidas para prevenirlos amparándose en que no hay certeza de que estos vayan a ocurrir/([16])
En ese contexto, llama la atención que la Sentencia de este Tribunal subraye que las mociones en auxilio de juris-dicción no se deben utilizar para casos que “no conlleven el nivel de importancia adecuado” y que se use ese criterio como fundamento para denegar la paralización solicitada en un caso como este, que, sin duda, es de alto interés público, basado en nuestra disposición constitucional y nuestra política pública de protección de los recursos naturales.([17]) El Corredor Ecológico del Noreste es una de las áreas de mayor valor ecológico que tiene Puerto Rico.([18]) Está compuesto por 3,057 cuerdas de terreno entre Luqui-11o y Fajardo, que incluyen casi todos los tipos de humeda-les costeros de la Isla y albergan más de 860 especies de flora y fauna, incluyendo 50 especies endémicas, vulnera-bles y en peligro de extinción, que dependen de la conser-vación integral de este ecosistema para sobrevivir/([19]) Ade-más, la vida natural del Corredor interactúa con las zonas protegidas adyacentes de la Reserva Natural de Las Cabe-zas de San Juan, la Reserva Natural del Río Espíritu Santo y el Bosque Nacional El Yunque. En los últimos cua- *1065 renta años, agencias estatales y federales han promovido diversas iniciativas para conservar los ecosistemas natura-les de esta región y organizaciones internacionales han so-licitado la protección del Corredor por ser el área de ani-daje más importante del tinglar, la tortuga marina más grande del mundo, que se encuentra en peligro de extinción. Si algún caso cumple con el requisito de “impor-tancia adecuada” enunciado por una mayoría del Tribunal es este caso.
El inmenso valor ecológico del Corredor llevó a que la totalidad de los terrenos que lo componen se declarara Re-serva Natural en el 2008, por orden ejecutiva.([20]) Su impor-tancia también fue reconocida recientemente por el Senado y la Cámara de Representantes de Puerto Rico al aprobar, ambos cuerpos por unanimidad, el Proyecto 2282, que se convirtió en ley con la firma del gobernador Luis Fortuño el 25 de junio de 2012.([21]) El proyecto de ley, que se identi-fica como “un primer paso para proteger efectivamente y a perpetuidad los terrenos que componen el Corredor Ecoló-gico del Noreste”,([22]) afirma que “[a] pesar de su gran valor natural, el CEN ha estado amenazado por la propuesta construcción de varios proyectos residenciales-turísticos y el desparrame urbano experimentado durante las últimas décadas en la zona costanera y en la región noreste de la Isla”.([23]) La nueva ley ordena la conservación de todos los terrenos públicos y patrimoniales del Estado dentro del Corredor, equivalentes al 66% de la reserva natural original. ([24])
*1066 Asimismo, la trascendencia de esta zona para la socie-dad puertorriqueña se reflejó en la presentación de cuatro alegatos como amigos de la corte en el presente caso de agrupaciones que incluyeron las organizaciones profesio-nales Sociedad Puertorriqueña de Planificación y Colegio de Arquitectos y Arquitectos Paisajistas, así como las co-munidades católicas y evangélicas de los pueblos aledaños al Corredor. Todas estas personas expresaron su preocupa-ción ante el peligro en el que este Tribunal colocó al Corre-dor al suspender la paralización ordenada por el foro ape-lativo y las repercusiones que la resolución de esta controversia tendrá sobre la conservación de los recursos naturales del País y su disfrute por las generaciones pre-sentes y futuras.([25])
La designación del Area de Planificación Especial de la Gran Reserva del Noreste, que se está impugnando en el Recurso de Revisión, se aprobó mediante exclusión categó-rica, un mecanismo para eximir del requisito de preparar *1067 un documento ambiental —evaluación ambiental o decla-ración de impacto ambiental— reservado para situaciones en las que se determina que la acción propuesta es prede-cible o rutinaria que no tendrá un impacto ambiental significativo. Las construcciones de proyectos en los terre-nos del Corredor que antes estaban protegidos se viabiliza-ron de acuerdo con el Plan y Reglamento de Calificación Especial de la nueva Gran Reserva, que también se está impugnando en el Recurso de Revisión y que permite la recalificación de los terrenos para consentir usos más intensos. La moratoria a las consultas de ubicación, los permisos y las obras de construcción en el área del Corre-dor que estuvo vigente desde el 2009 se eliminó con la aprobación del Area de Planificación E special. ([26]) A este panorama se añade la simplificación de los procesos para ob-tener permisos de construcción y la reducción de mecanis-mos de revisión administrativa sobre otorgación de permisos que estableció la Ley para la Reforma de los Pro-cesos de Permisos de Puerto Rico.([27])
Ante este cuadro y el hecho de que los terrenos del Co-rredor eliminados de la zona protegida mediante la apro-bación del Area de Planificación Especial de la Gran Re-serva del Noreste corresponden a los que han sido identificados para construir los proyectos incluidos en la lista que se presentó en la moción de auxilio de IDS, era lógico que el Tribunal de Apelaciones concluyera que, de no emitir la orden de paralización con carácter de urgencia, los peticionarios se expondrían a un daño irreparable. Este Tribunal debió haberle brindado deferencia a esa decisión y haberle permitido que resolviera los méritos del caso ante sí con la garantía de no perder su jurisdicción que le proveía la paralización. Si algún caso era de tal importan- *1068 cia que exigía que el foro apelativo actuase en auxilio de su jurisdicción, éste era el caso. No es razonable esperar a cuando ya sea muy tarde.
Por todo lo anterior, disiento.

(1) Los hechos más relevantes para la controversia están resumidos en la Sen-tencia, por lo que no los repetiremos. No obstante, debemos resaltar unos datos que no se mencionan en la Sentencia y que están directamente relacionados con uno de los señalamientos de error del recurso de revisión. Estos son: que el Plan de Califi-cación del Área de Planificación Especial de la Gran Reserva del Noreste no estuvo disponible para el público interesado en presentar comentarios en la vista en la fecha requerida y que no se permitió que todas las personas que solicitaron deponer en la vista participaran.

(2) Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 925 (1998). Véase, también, Lozada Sánchez et al. v. JCA, 184 D.P.R. 898 (2012).

(3) Petición de certiorari, págs. 20-21.

(4) Resolución del TA, KLRA 2011 00747, pág. 3. Apéndice de la Petición de certiorari, pág. 5.

(5) Véase Alegato como amicus curiae del Colegio de Arquitectos y Arquitectos Paisajistas de Puerto Rico de 13 de febrero de 2012, págs. 10-11.

(6) Véase Solicitud de Intervención como Amigo de la Corte y Alegato del Mon-señor Eusebio Ramos Morales de 13 de febrero de 2012, pág. 5. El Obispo de la Diócesis Católica de Fajardo-Humacao expresó que los desarrollos turísticos y comer-ciales que amenazan la integridad del Corredor son innecesarios porque en la Carre-tera Núm. 3 hay tres proyectos a mitad y en áreas cercanas hay muchos otros abandonados. Véanse, también: Departamento de Recursos Naturales y Junta de Planificación, Declaración de Impacto Ambiental Estratégica, Plan Integral de Usos de Terrenos y Manejo de la Reserva Natural del Corredor Ecológico del Noreste, septiembre 2008, págs. 155-180, 219-220 y 259-267; Apéndice de la Petición de certiorari, págs. 1141-1165, 1205-1206 y 1245-1253. El Plan Integral, por ejemplo, señala que, según análisis preparados por la Asociación de Bancos, la demanda de vivienda en la región noreste ha sufrido una reducción drástica. Id., pág. 174; Apén-dice de la Petición de certiorari, pág. 1160. El inventario de habitaciones e instala-ciones turísticas en la zona es extenso. íd., págs. 174-179; Apéndice de la Petición de certiorari, págs. 1160-1165.

(7) Es necesario señalar que, utilizando el mismo análisis que plantea la Sen-tencia, se tendría que concluir que la solicitud de auxilio presentada por el Gobierno ante este Tribunal no cumplió con los requisitos para que se suspendieran los efectos de la paralización decretada por el foro apelativo. Esto porque no contiene argumen-tos sobre un perjuicio directo e inmediato. Sólo menciona, en términos generales, que se paralizan “ciertas funciones consecuentes a la difícil labor de implantación de política pública de gobierno”, a pesar de que la Resolución del Tribunal de Apelacio-nes excluye expresamente de la paralización ciertas funciones administrativas nece-sarias para formular la política pública. Lo que paralizó el foro apelativo fue la consideración y la concesión de permisos a entes privados. Siguiendo las exigencias de la Sentencia, habría que observar que la moción del Gobierno no incluyó una lista *1061 de proyectos que se encontraran en esa etapa y tuvieran un impacto positivo en el interés público. Faltando esto, y según el método de análisis que adopta una mayoría de este Tribunal, es forzoso concluir que la paralización concedida por el Tribunal de Apelaciones no estaba causando daño alguno.

(8) García López y otros v. E.L.A., 185 D.P.R. 371 (2012). Vale recalcar que los criterios para emitir órdenes de paralización —la probabilidad de prevalecer en los méritos de la apelación, el daño irreparable que sufrirá el peticionario de no conce-derse, que las demás partes interesadas no sufrirán un daño sustancial si se concede y que no se peijudica el interés público con la concesión — • se establecieron en Peña v. Federación de Esgrima de P.R., 108 D.P.R. 147, 154 (1978), para guiar a los juzgadores. No obstante, el propósito de ese análisis no es verificar que se cumpla con lo que se puede interpretar que significa cada criterio por separado, sino que los tribunales puedan determinar si una orden de ese tipo es necesaria para preservar su jurisdicción en el caso que tengan pendiente de adjudicación.

(9) Aunque la cantidad de palabras contenidas en una moción no importa tanto como su contenido, debemos aclarar que, cuando la Sentencia enfatiza que la moción en auxilio de jurisdicción sólo incluye cinco párrafos de alegaciones, se refiere a la discusión bajo el acápite de “daño irreparable”, que se tiene que leer en conjunto con otras secciones de la moción a las que hace referencia. La moción, que tiene nueve páginas en total, incluye fundamentos para evidenciar que cumple con todos los requisitos del citado Peña v. Federación de Esgrima de P.R.

(10) Sentencia, pág. 10. Moción Solicitando Orden en Auxilio de Jurisdicción ante el Tribunal de Apelaciones, págs. 2-3 y 5-6, Apéndice de la Petición de certio-rari, págs. 123-124 y 126-127.

(11) La moción enumera cinco proyectos que se encuentran en proceso de eva-luación para construirse dentro del Corredor, con sus números de caso ante las agen-cias: “San Miguel Resort (DIA-PA JCA-01-0030 (CT) / C.U. 2001-23-0961-JPU); Dos Mares Resort (DIA-E JCA-99-015 (JP) / C.U. 1998-24-0681-JPU); Paradise Found Villas (C.U.2006-24-0534-JPU); Seven Seas Resort (C.U.1996-24-0003-JPU), y Playa Azul Center (C.U.2008-23-0444-JPU)”. Moción Solicitando Orden en Auxilio de Ju-risdicción ante el Tribunal de Apelaciones, pág. 3, Apéndice de la Petición de certio-rari, pág. 124. También menciona otros proyectos pendientes en áreas cercanas al Corredor, resoluciones de la Junta de Planificación y controversias sobre derechos de opción sobre terrenos públicos en el Corredor. Id.

(12) Véase Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 79-80 (2000).

(13) Sentencia, pág. 10.

(14) Por ejemplo, a principios de este mes ordenamos que se suspendiera el permiso de construcción de una torre de telecomunicaciones mientras atendíamos la controversia de si se cumplió con lo dispuesto en los reglamentos de planificación al otorgar el permiso. Municipio de San Sebastián v. QMC Telecom, LLC, CC-2012-233.

(15) Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 681-682 (1997).

(16) Art. 4(b)(5) de la Ley sobre Política Pública Ambiental, Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001a(b)(5)).

(17) Sentencia, pág. 8. Véase Art. VI, sec. 19, Const. P.R., L.P.R.A., Tomo 1.

(18) Véase Exposición de Motivos del P. del S. 2282 de 22 de septiembre de 2011.

(19) Véase Departamento de Recursos Naturales y Junta de Planificación, De-claración de Impacto Ambiental Estratégica, Plan Integral de Usos de Terrenos y Manejo de la Reserva Natural del Corredor Ecológico del Noreste, septiembre 2008, págs. 31-153, 181-220; Apéndice de la Petición de certiorari, págs. 1019-1139,1167-1206. íd., Anejos 6-13 (listas de elementos críticos, invertebrados, peces, anfibios, reptiles, aves, mamíferos y plantas que se encuentran en el Corredor); Apéndice de la Petición de certiorari, págs. 1426-1480.

(20) Órdenes Ejecutivas OE-2007-37 y OE-2008-22; Junta de Planificación, Re-soluciones PU-02-2008-24 y R-08-37-2.

(21) La medida fue aprobada en el Senado el 23 de abril de 2012 y en la Cámara el 21 de mayo de 2012. Las enmiendas sugeridas por el Gobernador para aclarar unas incongruencias en los números de catastro que se citaban fueron aprobadas por la Cámara y el Senado el 14 de junio de 2012.

(22) P. del S. 2282 de 22 de septiembre de 2011, pág. 4.

(23) íd., pág. 3.

(24) Aún quedarían desprotegidas 450 cuerdas de los terrenos del Corredor, den-tro de las cuales están proyectados los desarrollos en pugna.

(25) La Sociedad Puertorriqueña de Planificación indicó que, debido a su deber ético de contribuir al mejor desarrollo urbano, ambiental, social y económico de Puerto Rico; al alto interés público de la controversia y a que siempre ha abogado por la protección íntegra del Corredor, recomendada mantener la paralización de los trámites de permisos. Explicó que, de lo contrario, se permitiría un cambio drástico en las calificaciones de uso del suelo y la construcción de proyectos que, sin la debida planificación, impactarían significativamente los ecosistemas de la zona. Véase Mo-ción para Intervenir como Amicus Curiae de la Sociedad Puertorriqueña de Planifi-cación de 13 de febrero de 2012. El Colegio de Arquitectos urgió a mantener la paralización. Señaló que argumentar que los daños ocasionados por un permiso son especulativos porque sólo la construcción efectiva puede tener impacto en el am-biente equivale a erradicar la función previsora de la planificación. Afirmó que es imperativo corregir la idea expresada por el Estado de que un plan que incide sobre la calificación del suelo no conlleva, de por sí, efecto ambiental alguno. Véase Alegato del Colegio de Arquitectos, supra. La Iglesia Evangélica Unida de Puerto Rico ha solicitado, desde el 2007, que se proteja el Corredor, pues sus miembros disfrutan de los recursos naturales del área y entienden que es responsabilidad de los seres hu-manos promover la justicia ecológica ya que Dios creó la naturaleza con un propósito definido y las personas no pueden alterarlo mediante una explotación irresponsable que resulta en la degradación de su calidad de vida. Véase Solicitud de Intervención como Amigo de la Corte y Alegato del Reverendo Edward Rivera Santiago de 13 de febrero de 2012. La Diócesis Católica de Fajardo-Humacao también ha pedido que se mantenga el Corredor como una reserva ecológica y los feligreses de las parroquias cercanas al Corredor participan en actividades de concienciación sobre la importan-cia de los recursos naturales de la zona y la protección del tinglar como parte de su deber cristiano de proteger la creación para el bienestar de la humanidad. Véase Alegato del Monseñor Ramos Morales, supra.

(26) La Junta de Planificación estableció la moratoria en su Resolución PU-002CEN-24(23) de 3 de noviembre de 2009 y la extendió mediante sus Resoluciones PU-002-CEN-24(23)-02 de 5 de mayo de 2010 y PU-002-CEN-24(23)-03 de 27 de agosto de 2010.

(27) Ley Núm. 161-2009 (23 L.P.R.A. secs. 9011-90280.